# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 30, 2010 Session

## BETHANY (BUMGARNER) SCHROEDEL v. TIMOTHY ADAM BUMGARNER

**Appeal from the Chancery Court for Hamblen County**
**No. 2004-382      Thomas R. Frierson, II, Chancellor**

_____

**No. E2009-02299-COA-R3-CV - FILED OCTOBER 13, 2010**

_____

Bethany (Bumgarner) Schroedel ("Mother") and Timothy Adam Bumgarner ("Father") are the divorced parents of one minor child ("the Child"). In October of 2007, Mother filed a petition alleging, among other things, that Father was refusing to allow Mother her visitation with the Child. Mother's petition sought, in part, to modify the parenting plan to name Mother as the Child's primary residential parent. After a trial, the Trial Court entered an order on June 29, 2009 finding and holding that a change of circumstances existed that affected the Child's well-being in a meaningful way, but not one sufficient to justify a change in primary residential custody. The Trial Court's June 29, 2009 order did modify the parenting plan to allow Mother greater visitation. Mother appeals to this Court raising an issue regarding the Trial Court's refusal to change primary residential custody, and an issue regarding the Trial Court's finding her in contempt. We affirm the Trial Court's order as to the parenting plan, vacate the Trial Court's order finding Mother in contempt, and remand for further proceedings in compliance with this Opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed; in part; Vacated, in part; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Wayne R. Stambaugh, Morristown, Tennessee, for the appellant, Bethany (Bumgarner) Schroedel.

## OPINION

## Background

At the time of the parties' divorce, Mother was named the primary residential parent for the Child, and Father was granted visitation. The custody designation was changed later with Father then being the primary residential parent. Both Mother and Father remarried in 2006. Disputes arose in connection with Mother's visitation with the Child. In August of 2007 the parties mediated, and the Trial Court entered an Agreed Permanent Parenting Plan Order on August 23, 2007. In October of 2007, Mother filed the instant petition alleging, among other things, that Father was refusing to allow Mother her visitation with the Child. Mother's petition sought, in part, to modify the parenting plan to name Mother as the Child's primary residential parent.

Mother testified at trial that she and Father were married for approximately three and a half years. Mother initially was named the primary residential parent for the Child. Mother testified that during the time she was the primary residential parent:

> [Father] had fairly liberal visitation with [the Child]. He had him every other weekend and I think there was a couple of days through the week as well. Also we had a … despite the divorce and not getting along with each other we had a pretty good working relationship as far as [the Child] was concerned and if anything happened he had family in town or something of that nature and he wanted [the Child] we always worked together on those things.

During that time period Mother considered Father to be an "[e]xtremely good" father.

There was a change of custody in November of 2005. Father was named the primary residential parent and Mother was granted visitation. Mother testified that the change was made because:

> I was not doing things that I should at the time. I had a hard time maintaining a permanent residency. And [the Child] was staying with his father the majority of the time at that point because I didn't want to take him into a place that I didn't feel was appropriate for him.

Mother admitted that she was not able to care for the Child at the time she lost custody. When Father was named the primary residential parent, Mother was granted visitation.

Disputes arose with regard to Mother's visitation, and the parties went to mediation in August of 2007. During the mediation the parties agreed for Mother to see the Child every other weekend and one evening during the week for dinner. Mother testified that she saw the Child once in August of 2007 and once in September of 2007, but did not get any of the other visitation she was supposed to have under the mediated plan. Mother explained that by this time Father had remarried, and that Father had told Mother she was not going to receive any visitation. Mother then filed her petition in October of 2007 seeking to change custody. Mother received no Christmas visitation in 2007 and no visitation on the Child's birthday.

Mother testified that after entry of the mediated plan in August, she has visited with the Child during his lunch-time at school. Mother stated:

> To begin with when I had the visitation I would just start going to see [the Child] maybe two times a week and eating lunch with him and he asked me to start coming more and I did until I started having problems with my pregnancy and he asked for my mother to go in my place. And I still continue today to go every day and eat lunch with him.

Trisha Otum, the cafeteria manager at St. Clair Elementary School where the Child attends school, testified that Mother "has lunch with [the Child] every day. They get along good. She seems happy when she's there. She brings him a good meal. And he's seems [sic] very happy when she's there."

At the time of trial, Mother had two hours of supervised visitation with the Child every other Monday. Although Mother is supposed to have telephone contact with the Child, she stated that "doesn't happen on a regular basis still today. There are times when I do get that phone conversation with [the Child] and there are a lot of times I don't."

Mother has remarried. Mother and her husband ("Stepfather") were married for approximately a year and a half, then divorced, and later remarried. Mother has two minor children, the Child at issue in this case who was born in 2002, and a daughter born to Mother and Stepfather in July of 2008. Stepfather has a criminal record of misdemeanor charges including driving on a revoked license, theft under five hundred, and simple possession. Stepfather has had no convictions since 2006. Stepfather testified that he has not had any criminal charges and has not used drugs since he met Mother in 2006. Mother described Stepfather stating:

> He is an excellent father. He's very involved. He's one of the hands-on type of fathers. With my daughter he changes her diapers. He rocks her to sleep

-3-

as much as I do. He feeds her meals. He gives her bathes. He even helps with my sister's children when they are there. He loves children.

Mother testified that Stepfather has never been abusive to her or the Child.

Mother and Stepfather live in a three bedroom, two bath, double-wide trailer on a permanent foundation. She stated there were some problems with the home when they moved in, which she and Stepfather have repaired. They patched walls, fixed the heat pump, and put down new floors.

Around the end of 2007, Mother began to receive Social Security disability benefits for depression and anxiety. Mother receives $705 a month in Social Security. Mother takes Prozac but no other medications. Mother has a driver's license, but Stepfather does not.

Mother testified that she feels that Father and his new wife ("Stepmother") have tried to alienate her from the Child. Mother stated:

> I've been kept away from my son for a long period of time for what I feel is no apparent reason. At times I didn't know a reason. They've tried to keep him from … from seeing him at school every chance they've had. They tried not to do the phone conversations. They didn't want to do the visitation that we agreed to in mediation.

Mother does not believe that Father and Stepmother will abide by the Trial Court's orders because they have not in the past.

Mother stated:

> [The Child's] Father has been a good father. He's done a lot of things that I'm proud of him for. The only problem that I have with him is I think he lets his wife make too many decisions concerning [the Child] and although I believe his Father does have [the Child's] best interest at heart I don't believe his stepmother does.

Cathlyn C. Cannon, a licensed mental health counselor, senior licensed psychological examiner, and certified trauma specialist, testified at trial. Ms. Cannon performed a psychological and parenting evaluation of Mother and Stepfather. Ms. Cannon met with Mother on October 1, 2008 for two hours. Ms. Cannon also spent one hour with Mother, and one hour with Stepfather separately on October 8, 2008. Ms. Cannon then met

with Mother and the Child on December 22, 2008 and did a parenting evaluation.

Ms. Cannon described her evaluation stating that she did a diagnostic clinical interview, administered the Minnesota multi-phase personality inventory I and II, and administered a number of parenting assessment tools including a parenting stress index, and the uniform child custody evaluation system. Ms. Cannon stated that Mother's MPI II results "showed the test profile was valid. Her clinical scales were within normal limits. This would not be atypical of someone whose depression is being successfully managed. It showed that she did not display any other type of psychopathology or psychological disorder." The parenting stress index showed that Mother perceived the Child to be happy in general and perceived him to have some difficulty adjusting to the custody changes, but that Mother did not see her current stresses as based upon the parent/child relationship but upon outside factors.

Ms. Cannon stated:

[Mother] displayed positive attitude. She showed good coping skills with [the Child]. There were some issues initially when [Stepmother] brought [the Child] into my office …. [The Child] was very insecure and clingy with her with [Mother] in the room until [Stepmother] left. And what I noticed in the parenting abilities checklist was that [Mother] was easily able to reassure [the Child] that he was in a safe situation and it was okay for them to be together. He immediately displayed a comfort level with her and related to her as a parenting figure …. It shows that [the Child] feels a secure attachment bond with [Mother].

Ms. Cannon testified: "I believe from the information given to me that it is highly probable that parental alienation is a factor in this case, that there has been active activity … I'm sorry for the redundancy … to keep [the Child] from having full and unrestricted visitation with the mother at least."

Ms. Cannon found no evidence that Mother posed a threat of emotional, physical, or sexual abuse to the Child. She stated:

No reports were filed with DCS of any abuse at any point in time and especially the incident with [Stepfather] DCS was not no [sic] involved, no medical evidence was obtained. There does not appear to be any threat of physical, emotional, or sexual abuse to the child. There does not appear to be any developmental delays, or anxiety, or other things you would see in a child had the parent been abusive while in their custody. So my … I am completely

confident putting my clinical opinion that the mother has no threat of any form of abuse to the child. Does she pose good parenting attributes and abilities? He thrived while in her care. He shows positive emotional attachment and regard for her. I … she is within average intellectual ability. She is able to parent as good as probably top twenty percent (20%) especially compared to what we see. I have no problem stating that I think she possesses good parenting attributes and abilities. Has she been the primary caretaker of the child now and/or in the past? She provided primary care to [the Child] for the first three (3) years of his life which are some of the most significant years in a child's development. We know if that if [sic] a toddler is neglected significantly in the first three years of life they begin to show developmental delays which are completely absent. Which I referred to that he did not display any signs of failure to thrive. There was no developmental interruption in his care. What is the goodness of fit of the mother and child now and in the future? They appear to have a healthy relationship, a healthy attachment, when he is confident that he is not being observed by [Stepmother] he was immediately … as soon as she left he was immediately at ease with [Mother] and was extremely uncomfortable when [Stepmother] was there. You know that type of conflicted situation, it's hard for a child to … they can't process. They can't … they shouldn't have to cope with that type of emotional distress.

Ms. Cannon further stated:

My opinion is that four (4) hours a week is insufficient contact with a child in a lunchroom setting. When I talk to [the Child] I ask him because I know kids as they go to school start not wanting mommy all around them all the time. I said, "Does it make you uncomfortable that you have to see your mommy at school at lunch? Would you rather just have lunch with your friends?" And [the Child] told me, "No I want to see my mother. I wish I could see my mother more often. I wish I could see her without having to have other people around." My opinion of alienation is a direct intention of the Father not to allow her sufficient contact to meet the child's needs.

Stepmother testified at trial. Stepmother has two children fathered by another man, Nicholas DeAndria. Stepmother and Mr. DeAndria never married. Mr. DeAndria does not see his children, and Stepmother stated that was his choice. Several of Mr. DeAndria's relatives, however, do visit with these children.

Stepmother testified that she made allegations of sexual abuse against Mr. DeAndria. When asked about these allegations Stepmother stated:

-6-

Sexual abuse charges, a doctor had told me about that, that that was her opinion; physical abuse that he had done towards me and my minor children…. From what the doctor said. I was not there when it had supposedly occurred, but that's what a doctor had stated.

She testified that she called DCS and accused Mr. DeAndria of sexual abuse. When asked if she still maintains that claim, Stepmother stated: "That is what a doctor had stated to me what she thought." Stepmother admitted that DCS investigated her allegations against Mr. DeAndria and determined there was no proof of abuse.

In the instant case, Stepmother sent an ex parte letter to the trial judge in September of 2007. When asked about this letter, Stepmother stated:

I felt like … I just felt that [the Child] was at the time a child that was a slipping through the cracks, nobody really got to hear what [the Child] really had to say. We had tried taking him to talk to somebody and they would not talk to him because it was a custodial issue and I was worried about [the Child]. [The Child] had come to me several different times with different worries and concerns and just being a mother worried about him.

When asked what her concerns were, Stepmother stated:

My concerns were there was different things going on at the home that I do feel was influenced by [Mother] at the time. [The Child] when he was … when he didn't have visitations even when they were supposed to have been supervised there was a lot of things, he had nightmares, a lot of things he was worried about, and there was a lot of things going on at the home, people coming to the home and [the Child] said that he knew them and … from his past, different things that had happened to him in his past and it brought up a lot of concern and worry.

When Stepmother was asked to stop being vague and to state her concerns specifically, she stated:

Okay. Well there was two colored people that showed up to the house …. Yes. There was two men that came to the house looking for my husband and I said "He's not here." My husband has never been around people … you know … we go to church. There is nobody there of those people. Those particular people don't go to our church. They didn't work with my husband that I was aware of. And I said, "You know he doesn't live here." Because

-7-

I didn't know who they were and they looked like they were there to cause trouble. They came back fifteen (15) to twenty (20) minutes later. I had the blinds closed. I had the door shut. They then proceeded to cuss and said "The B-I-… is lying [Mother] said that he did live here." And they proceeded to bang on the front door. I did not answer the door.

Stepmother was shown a police report of the above related incident, but she denied that she waited three weeks to contact the police to report the incident. Stepmother testified at trial that the men looked familiar, like ones she had seen Mother with once in the past. During her pre-trial deposition, however, Stepmother testified that she had never seen those men until the came to the house on the day of the incident, and further, that she had never seen Mother with those men before.

Stepmother testified that the Child calls her "momma," and when asked why, Stepmother stated: "He just calls me momma." Stepmother also stated:

I had been concerned for quite some time but I know my place as a stepparent. I'm … I've been told several times my opinion doesn't matter. And when I heard and seen [the Child] the way he was acting and the way he sounded and the way he has come to me it did concern me. I did pray about it and I felt like that I should have wrote a letter to the Judge and I did. I didn't know that there was … that you couldn't do that. So that's why I did.

She testified further about the ex parte letter stating:

I was bringing up everything from the past, everything that I could think of that had happened, everything that was built up I was … I had been … I'm a mother. I'm a mother, to me, of three children. And I do worry. And when I have … as a stepparent and I've been told by several people I don't have rights. I don't have any right to get up and say anything. I didn't know it was okay or not okay to write letters to the Judge. And I had all these worries and concerns and that was brought to me … and that has happened to me and [the Child] on several times. [The Child] brought that to my attention. And I put everything I could think of in that letter while I was crying, while I was upset.

When asked if the Child ever lied, Stepmother stated: "He might have fibbed, but I have three children. I've noticed that children do that sometimes."

When asked who made the decision to stop visitations between the Child and Mother, Stepmother stated: "That was I believe my husband." When asked, Stepmother

agreed that court orders should be followed. Stepmother then was asked if there should be punishment for not obeying court orders and she stated:

> It depends on what the situation is .… I feel that if it is pertaining to a child and the child is in danger, if it's to protect the child I think that it's okay .… I don't think [the system of DCS and courts set up to protect children is] a very good system .… I do think the Judge and some Children Services, you know, I do think they make a decision based on what they hear and what they know but when you hear it out of a child's mouth it's something completely different. And I do feel at the time things were rushed through and [the Child] really has not been heard.

Mother's father ("Grandfather") testified at trial. He and his wife ("Grandmother") signed an affidavit in October of 2005 supporting Father's petition seeking custody at that time. Grandfather explained:

> [Mother] was having a little trouble that we didn't really understand. We knew that she needed help and we really like [Father] and we trusted him. And we felt like that [the Child] would be better off with him for a … you know, a time being until we could help [Mother] figure out what was going on and help get her straightened out.

Grandfather testified that since then "[Mother's] back to the girl she once was originally. She's back to living a normal good life."

Grandfather described a telephone conversation he had with Father in September of 2007 after Mother showed up for a visitation and was denied access to the Child. Grandfather stated:

> [Father] had told me that [Mother] had come up there and they were having these issues and these arguments and he had brought up some things that had been accused of [Stepfather]. And he told me … he said, "Well I guess I'm just not going to let her see [the Child] anymore." And I told him that that really wasn't right and we talked about it, you know, just a little bit more. And then he told me, he said, "Well …" and this is as close as I can get to his exact words. He told me at that time during that phone call, he said, "I don't know why that [the Child] tells [Stepmother] and his teacher these things and he won't tell me unless he's afraid I'll get mad at his mommy." And I really didn't say anything at the time. Like I said, all of this was new and just had started happening and I was thinking to myself, you know, there might be a

reason he's not telling you because he's probably not telling anybody. I don't think [the Child] had ever said any of that.

When asked if he had ever known Stepfather to be violent Grandfather stated: "No. In fact, that's so far away from [Stepfather] that it would ever be. I probably know him better than anybody and I don't think that you can make [Stepfather] mad or get him violent." Stepfather works for Grandfather. Grandfather stated: "I get along with him real well. He's … I feel like he's a fine fella. He goes fishing with me. He comes out and works around my house and stuff. And he helps me do things out there." Grandfather also stated: "To be honest I always liked [Father]. We … you know, I'd he'd [sic] work on his house. I kind of help him and give him some advice on what I thought or whatever, on cars, and just stuff like that."

Grandmother testified about the most recent visitations stating:

[Stepmother] came to my house all Summer and she pretty much just sat there through every single … well she did set there through every single visitation.… No but we didn't know that [she was not required to be there during visitations]. She called me up that day and said she was going to start bring[ing] [the Child] and I thought that was all out of the goodness of her heart. So I wasn't going to ask her to leave we were so thrilled to have him. It wasn't until later that I realized that we didn't have to let her stay there that whole time we never knew that …. She was sitting there right through the whole entire thing, right there. My living room is 14 x 16 or something. It's not a big room. And she sat right there in a chair right there in the middle.

Grandmother stated that Stepmother never allowed the Child to be alone with Mother.

Grandmother has never known Stepfather to be violent. When asked if the Child had ever said anything to her, Grandmother stated:

The first time I really knew something was not right was when out of the blue one day when my daughter had him and she had left to go to McDonald's because he wanted a Happy Meal and he just walked over to me and he said, "Nanna do you know who ruins my days?" And I said, "Well honey is somebody ruining your days?" And he said, "Every time." I said, "Well who ruins your days?" And he said, "[Stepmother] ruins my days. She says bad things about my mommy and I don't like it." And he did this, and he said, "I put my hands like this and I say I don't want to hear it and she just keeps right on talking." … "Daddy don't listen to me anymore he just listens to

-10-

[Stepmother].”

Grandmother further stated:

> [The Child] came to me just a few weeks back while I've been supervising this most recent visitation he had come from staying with [Father's parents] so I don't know what had been going on. But he came in my house and as soon as [Father] left he said, "Nanna now I want to tell you something and it's real important." And I said, "Okay." And he sat down in my lap and he said, "I want you to call the police right now." He said, "I want you to call the police right now about [Stepmother]." He said, "I want you to tell them about [Stepmother]. She's going to call the police on my daddy and my daddy's not done nothing wrong Nanna. Please call the police on [Stepmother] cause you know about [Stepmother]." He said, "You know about [Stepmother]. You call the police Nanna." And I tried to get him to make me understand what he said but he just said, "She's going to call the police on my daddy." He was very worried that she was going to call the police on his daddy. And I said, "Well what is she …" He said, "My daddy didn't do anything Nanna." He was very worried about that. So I don't know if he just witnessed an argument. I don't know. But he was upset that she was going to call the police on his daddy and he wanted me to call the police on her, which of course I couldn't do.

Grandmother has been supervising visitations between Mother and the Child since 2005. Grandmother testified:

> [Stepmother] called me early on and told me that she thought [Mother] was sexually molesting [the Child]. That was when I was supervising in the early days when they first got married. She called me and tried to say that and that just infuriated me because that was not even possible could happen under my supervision in my small home and with me right there all the time. Couldn't have even happened. And when that didn't go of course other things, she started saying these other things. And we knew they weren't true.

Grandmother also stated:

> I want to say this and be very clear about it. [Father] is a good man. I've never ever stated otherwise. He is at this time because he allows [Stepmother] to make the decisions about [the Child] and he leaves him alone with her and she is not a stable person in my opinion and she terrorizes this child. And I believe

-11-

he loves [the Child] with all his heart and I do believe he wants to do the right thing. I don't believe he knows everything that is going on in his house when he's gone to work. But other than that, [Father] does love [the Child]. But he is now since he married her unable to act in the best interest of the child because of this, because of his wife.

Father testified that unsupervised visitation between Mother and the Child did not work because:

[Mother] had called me when she had him and said that [Stepmother] had choked him with soap which was not true. I was there with him all the time except for when I worked, which was only eight hours a day. He had never told me about anything like that ever happening to him. And another time when he had went he had came home and he puked his guts up because his mother fed him six chocolate candy bars and Sprite for breakfast.

Father claimed that the Child has indicated he is afraid of Stepfather and Mother. Father stated:

[The Child] had told me that [Stepfather] had pushed him away from the refrigerator when he tried to get a drink and it caused him to hit the table, the kitchen table and it left a bruise on his back. That was physical abuse by [Stepfather].

Father also stated that the Child had said that Stepfather called him a profane name. Stepfather testified and denied that this alleged incident ever happened. Father testified at trial that the alleged pushing incident with Stepfather happened in August or September of 2007 during one of the two unsupervised visitations Mother was allowed. Father, however, answered interrogatories in the instant suit claiming that this alleged incident happened in June of 2007. Father never contacted DCS about the alleged abuse.

Father testified that he made the decision to stop visitation between Mother and the Child. He stated: "I feel like I acted on instinct when I done that. Like I said earlier I seeked legal counsel until we could get a mediation agreement arranged. I didn't feel it would be safe for [the Child] to go back with her just like anyone else would have felt, any other concerned parent would have felt." When asked what Mother had to do to prove to him she should have unsupervised visitation, Father stated: "She's never been trustworthy." Father stated:

[Mother's] going to have to make sure that [the Child] is safe and never being

abused or being left alone with people that's untrustworthy. And her … even … I can see a difference in her now than then. I do feel like she's on the right path to coming back to being a good person and being able to, you know, handle unsupervised visitations. But it's … with all the events that have happened, you know … we're talking about two years. There's been a lot that's changed, you know, a lot of things that's happened during the course of all of this …. Supervised visitations always work out great. [The Child] is happy. He likes being with them. He never comes home stuttering. He never comes home with any sort of stories to tell me of anything or any new words that he's learned, any curse words. Cause we don't use that type of language. Those are the types of things that I'm talking about that's untrustworthy and not good and healthy for a child to be exposed to violence, and you know to be abused. I can't live with myself knowing that my son would be abused in [Mother's] care unsupervised.

Father further testified:

I feel like I've been a very good dad to [the Child]. I love him with everything in me. He means the world to me just like [Stepmother's two children] mean the world to me. They're my children. I consider them my children too. And I do love [the Child] very much and would make sure that he's always safe and well taken care of. That's my main focus.

Father admitted that he did not notify Mother that the Child was having tubes placed in his ears. Father also admitted that he did not notify Mother about the Child's basketball games. Even though there is a court order for him to pay a portion of the Guardian ad litem's fees Father has not paid his portion. Father stated: "I didn't hire her …. Yes I do know it's a Court Order but I didn't hire [the Guardian ad litem]."

On June 29, 2009 the Trial Court entered its judgment finding and holding, *inter alia*:

The evidence preponderates in favor of a finding that at the time of the entry of the current Permanent Parenting Plan, [Father] and [Mother] had each remarried. Following a controversy between [Father] and [Mother] on or about September 14, 2007, [Father] discontinued co-parenting time in favor of [Mother]. The mother's co-parenting time with the minor child did not resume until the mediation agreement was achieved in February 2008. Since that time, [Mother's] co-parenting time with [the Child] has been limited to supervised visits and frequent school lunch visits.

-13-

At the time of the entry of the present Permanent Parenting Plan, [Mother] presented a history of chemical dependency and depression. On July 24, 2007, prior to the current plan, [Mother] had submitted an application with the Social Security Administration which contained the following general remarks:

> I feel that I would rather sleep my life away then (sic) to face my problems and worries. I get side-tracked quickly and forget what I'm doing. I give up on tasks when they get difficult or worry me too much. I can't concentrate on one thing because I have so many thoughts racing through my mind. I have difficulty understanding people for my inability to concentrate on what they are saying. I don't follow verbal instructions well because I don't like to be told what to do. I don't interact with people very well because I am easily irritated.
>
> I lost custody of my son for my inability to take care of him. I have had multiple miscarriages making my depression worse. In May of 2006, I committed myself to alcohol and drug rehabilitation at New Hope Recovery Center for alcohol and cocaine dependence. I used these chemicals to medicate myself for depression and they helped me with my anxiety disorder.

[Stepfather and Mother] were divorced by Final Judgment entered April 17, 2008. [Mother and Stepfather's] daughter … was born on July 8, 2008. During October 2008 and December 2008, Ms. Cathlyn C. Cannon, M.A., conducted a comprehensive psychological and parenting evaluation regarding [Mother and Stepfather] and the minor child [the Child].

According to her written report, Ms. Cannon's psycholegal formulations and recommendations contained the following pertinent opinions:

> PSYCHOLEGAL FORMULATIONS: The issue before the court is to determine the best interest of the child in making a determination of custody or visitation. After considering the validity of the information received and the assessment results, I have considered five factors in arriving at my conclusions and recommendations:
>
> 1. Does the Mother pose a threat of physical, emotional or

-14-

sexual abuse to the child? No medical or psychological evidence of any threat of physical, emotional or sexual abuse by the mother or her partner to the child was presented in this evaluation.

2. Does the Mother possess good parenting attributes and abilities? [Mother's] parenting abilities were demonstrated to be within average limits.

3. Has the Mother been the primary caretaker of the child now and in the past? [Mother] provided primary care of [the Child] for the first three years of his life. He did not appear to display any signs of failure to thrive or developmental interruption while in her care.

4. What is the "goodness of fit" between the Mother and the child now and in the future? [Mother] and [the Child] appear to have a healthy relationship. He demonstrated perception of her as his emotional mother figure. She demonstrated a positive emotional maternal attitude toward him. They were comfortable and relaxed with each other.

\* \* \*

RECOMMENDATIONS FOR CUSTODY AND VISITATION: [Mother] admittedly had a problem with cocaine during 2005. She has completed treatment for her chemical dependence. She is able to manage her depressive disorder with antidepressant medication, and has not required psychiatric hospitalization, as is common in severe depressive patients. She has maintained a stable residence and financial situation since her divorce from [Father]. When she was forced to surrender custody, she focused on obtaining treatment and maintaining stability. She has expressed a desire to regain custody of [the Child]. Her assessment results show her to be functioning with [sic] average limits psychologically and as a parent. No indications of maltreatment by [Mother] or her partner [Stepfather] were indicated in the assessment.

[The Child] appears to be performing well at St. Clair Elementary

-15-

School. School records do reflect, however, that the child has had a significant number of school absences and tardies.

The relationship between [Mother] and [Father and Stepmother] is strained. The [Father and Stepmother] have made allegations of abuse against [Mother and Stepfather], but such allegations have not been reported to the Department of Children's Services or other authorities. [Stepfather] maintains a criminal history, but no convictions have been entered since 2006.

[Father] and [Mother] each appear to be appropriately disposed to provide the minor child with food, clothing, medical care, education and other necessary care. Loving, affectionate and emotional ties exist between the child and his parents.

[Mother's parents] executed an affidavit on October 24, 2005 indicating in pertinent part that in their opinion "to continue the child's present custody arrangement with [Mother] as his primary parent is endangering the health, welfare and safety of the child and is not in his best interest." [Mother's parents] at that time recommended that their daughter, [Mother], exercise only supervised visitation with [the Child]. Since the entry of the current Permanent Parenting Plan, [Mother's parents] have been assisting with the supervised co-parenting time in favor of [Mother]. According to the testimony of [Mother's parents] during the trial, in their opinion, [Mother] has made significant progress and improvements with reference to caring for the child.

The changes in circumstances since the Permanent Parenting Plan have affected the child's well being in a meaningful way. Some of the changes could not have been anticipated at the time of the entry of the current Permanent Parenting Plan. These changes, however, have not been of such a nature so as to warrant a change in the designation of primary residential parent status. The changes of circumstances however do support a modification in residential schedules, some parenting responsibilities, decision making authority and special conditions.

\* \* \*

[T]he Court determines that the best interests of the child do not warrant the significant measure of supervised visitation. Instead, the Court imposes certain conditions which are designed to support and protect the welfare of the child. Considering the applicable factors and other criteria upon which

Tennessee courts make parenting determinations, this Court concludes that the manifest best interests of the parties' minor child will be served by the residential schedules, parenting responsibilities, and special conditions as directed in the Permanent Parenting Plan adopted contemporaneously.

(footnotes omitted).

Mother appeals to this Court. Father made no appearance in this appeal.

## **Discussion**

Although not stated exactly as such, Mother raises two issues on appeal: 1) whether the Trial Court erred in failing to find a material change in circumstances sufficient to justify a change in primary residential custody; and, 2) whether the Trial Court erred in finding Mother in contempt for allegedly failing to reimburse Father for a vehicle indebtedness.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first consider whether the Trial Court erred in failing to find a material change in circumstances sufficient to justify a change in primary residential custody. Existing custody arrangements are favored because children thrive in stable environments. *Hoalcraft v. Smithson*, 19 S.W.3d 822, 828 (Tenn. Ct. App. 1999). A custody decision, once made and implemented, is considered res judicata upon the facts in existence or those which were reasonably foreseeable when the decision was made. *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001). However, our Supreme Court has held that a trial court may modify an award of child custody "when both a material change of circumstances has occurred and a change of custody is in the child's best interests." *Kendrick v. Shoemake*, 90 S.W.3d 566, 568 (Tenn. 2002). According to the *Kendrick* Court:

> As explained in *Blair* [*v. Badenhope*, 77 S.W.3d 137 (Tenn. 2002)], the "threshold issue" is whether a material change in circumstances has occurred after the initial custody determination. *Id*. at 150. While "[t]here are no hard and fast rules for determining when a child's circumstances have

-17-

changed sufficiently to warrant a change of his or her custody," the following factors have formed a sound basis for determining whether a material change in circumstances has occurred: the change "has occurred after the entry of the order sought to be modified," the change "is not one that was known or reasonably anticipated when the order was entered," and the change "is one that affects the child's well-being in a meaningful way." *Id*.

*Kendrick*, 90 S.W.3d at 570. *See also* Tenn. Code Ann. § 36-6-101(a)(2)(B) (2005).

The *Kendrick* Court went on to explain that if a material change in circumstances has been proven, "it must then be determined whether the modification is in the child's best interests … according to the factors enumerated in Tennessee Code Annotated section 36-6-106." *Kendrick*, 90 S.W.3d at 570 (footnote omitted). It necessarily follows that if no material change in circumstances has been proven, the trial court "is not required to make a best interests determination and must deny the request for a change of custody." *Caudill v. Foley*, 21 S.W.3d 203, 213 (Tenn. Ct. App. 1999).

In the case now before us the Trial Court specifically found and held:

The changes in circumstances since the Permanent Parenting Plan have affected the child's well being in a meaningful way. Some of the changes could not have been anticipated at the time of the entry of the current Permanent Parenting Plan. These changes, however, have not been of such a nature so as to warrant a change in the designation of primary residential parent status. The changes of circumstances however do support a modification in residential schedules, some parenting responsibilities, decision making authority and special conditions.

The Trial Court, however, found and held that although a change in primary residential custody was not warranted, the lower threshold contained in Tenn. Code Ann. § 36-6-101(a)(2)(C) with regard to a modification of a residential parenting schedule had been met. As a result, the Trial Court modified the residential parenting schedule to give Mother greater visitation.

The evidence, as discussed fully above, does not preponderate against the Trial Court's findings. While Father's and Stepmother's actions interfering with Mother's and the Child's parent-child relationship are of serious concern, we cannot say that the evidence preponderates against the Trial Court's finding that it does not yet rise to the level of a material change of circumstances sufficient to change custody. We find no error in the Trial

-18-

Court's refusal to change primary residential custody.

We caution Father that part of his role as the primary residential parent is "to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents …." Tenn. Code Ann. § 36-6-106(a)(10) (Supp. 2009). Father does not have the right to unilaterally stop Mother's court-ordered visitation as he has done in the past. Furthermore, the record reveals that Stepmother has attempted to improperly insinuate herself into matters regarding the Child's custody and visitation. These actions are not in the best interest of the Child, and we trust that Father will take steps to insure that such behavior does not happen in the future, or be faced with the consequences of his actions.

Next we consider whether the Trial Court erred in finding Mother in contempt for allegedly failing to reimburse Father for a vehicle indebtedness. We note that Father did not file any brief in this appeal.

Father filed a counter-petition on January 29, 2009, which was less than five days before the beginning of trial on February 2, 2009. Father's counter-petition alleged, in part, that Mother was in contempt for failing to abide by a court order to repay Father for a vehicle indebtedness. At the beginning of the trial, the Trial Court held that the counter-petition on the issue of contempt was not timely and would not be heard at that time, but would be scheduled for a later hearing. The case was then tried over several days including February 2nd, April 2nd, and April 3rd, of 2009. Mother testified during the first day of trial and when asked admitted that she had been ordered to pay Father $700 for this vehicle indebtedness and had failed to do so. During his testimony given on April 3, 2009 at the end of the trial, Father was asked about the vehicle indebtedness. Mother's counsel objected on the basis that Mother was not provided with the information and exhibits regarding this issue prior to trial. The Trial Court sustained the objection.

In its order the Trial Court found Mother in contempt and awarded Father a judgment of $1,900 against Mother for the vehicle indebtedness. There is, however, no evidence in the record on appeal with regard to an amount of $1,900. Father's testimony was objected to in a timely fashion, and the Trial Court sustained the objection.

As the Trial Court stated at the beginning of trial that this issue would need to be tried separately, and the Trial Court sustained Mother's objection to Father's testimony with regard to this issue, Mother should not have been held in contempt. Furthermore, there is no evidence in the record on appeal to support a judgment of $1,900 for a vehicle indebtedness. We, therefore, vacate the finding of contempt against Mother and the judgment for $1,900 against Mother and remand to the Trial Court for further proceedings

on this issue as necessary.

## **Conclusion**

The judgment of the Trial Court is affirmed as to the modification of the parenting plan, and is vacated as to the finding of contempt against Mother and as to the judgment against Mother for $1,900. The remainder of the Trial Court's judgment is affirmed, and this cause is remanded to the Trial Court for further proceedings as necessary in compliance with this Opinion and for collection of the costs below. The costs on appeal are assessed one-half against the appellant, Bethany (Bumgarner) Schroedel, and her surety; and one-half against Timothy Adam Bumgarner.

_____
D. MICHAEL SWINEY, JUDGE